Anthony CARACCIOLO, Petitioner

v.

James McDONOUGH, Secretary,
Florida Dept. of Corrections,
Respondent.

No. 97–1139–CIV–JORDAN.

United States District Court,
S.D. Florida,
Miami Division.

Oct. 18, 2006.

John H. Lipinski, Esq., Rhonda Anne Anderson, Coral Gables, FL, for Plaintiff.

Consuelo S. Maingot, Attorney General Office, Department of Legal Affairs, Miami, FL, Frank J. Ingrassia, Esq., Powers McNalis & Torres, West Palm Beach, FL, for Defendants.

### ORDER REJECTING CLAIM OF ACTUAL INNOCENCE AND CLOSING CASE

JORDAN, District Judge.

On March 7, 1986, before daylight, Miami millionaire Stanley Cohen was found murdered in bed at his Coconut Grove home. The highly-publicized homicide, *see generally* CAROL SORET COPE, IN THE FAST LANE: A TRUE STORY OF MURDER IN MIAMI (1993), resulted in the indictment of Mr. Cohen's wife, Joyce Lemay Cohen, and two men—Anthony Caracciolo and Thomas Joslin (also known as Thomas Lamberti)—for murder. Ms. Cohen was tried separately, and in 1989 a jury found her guilty of first-degree murder for hiring Mr. Caracciolo, Mr. Joslin, and another man—Frank Zuccarello—to kill her husband. Ms. Cohen was sentenced to life in prison.

Two years later, in 1991, Mr. Caracciolo, who had been charged as one of the contract killers, pled nolo contendere to a reduced charge of second-degree murder and conspiracy to commit murder. Pursuant to a plea agreement, he was sentenced to a total of 41 years in prison (later reduced to 40 years). After unsuccessfully seeking post-conviction relief in the Florida courts, Mr. Caracciolo filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Mr. Caracciolo initially challenged his conviction and sentence on seven grounds, but subsequently withdrew two of those grounds, Claim II (claim that trial counsel was ineffective with respect to advice given about the possibility of a habitual offender sentence and for failing to litigate a motion to suppress statements), and Claim VII (claim that trial counsel was

ineffective for failing to challenge the validity of the plea on the ground that there was no factual basis for it).

In an order issued a little more than a year ago, *see* Memorandum Order [D.E. 156] (May 12, 2005), I denied Mr. Caracciolo relief on the merits of Claims I (claim that the plea was unknowing and involuntary because trial counsel provided incorrect advice about the possibility of a habitual offender sentence), VI (claim that the trial court violated the Double Jeopardy Clause when it entered an amended judgment), and VII (claim that the state breached the plea agreement, thereby violating due process). I also found that Claims IV (claim that state courts denied due process when they failed to hold an evidentiary hearing on the motion for post-conviction relief), and V (claim that the plea was entered based on perjured testimony and failure of the state to turn over exculpatory evidence) were procedurally barred. With respect to Claims IV and V, I ordered an evidentiary hearing on Mr. Caracciolo's claim of actual innocence to determine whether Mr. Caracciolo could overcome the procedural bar.

The evidentiary hearing, which resembled a mini-trial, was held over several days in July of 2005. Over 20 witnesses testified, and numerous exhibits were introduced. The parties agreed at the beginning of the hearing that I could and should consider the trial transcript from Ms. Cohen's criminal case, which are now a part of the record in Ms. Cohen's own habeas corpus proceeding. *See Cohen v. Anderson*, 01–4865–Civ–Jordan.[1] Accordingly, I have reviewed the transcript of Ms. Cohen's trial, which is over 8,500 pages.

This order was held pending the Supreme Court's decision in *House v. Bell*,

---

1. Ms. Cohen's habeas corpus case is also assigned to me.

—— U.S. ——, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006), an actual innocence case. Applying *House* to the record before me, I find that Mr. Caracciolo has not established actual innocence so as to overcome the procedural bar on Claims IV and V. Because I do not reach the merits of Claims IV and V, the respondent's motion [D.E. 157] for reconsideration of the May 12, 2005, order is denied as moot.

## I. PROCEDURAL BACKGROUND

The protracted proceedings in this case began in 1988, when state prosecutors indicted Ms. Cohen, Mr. Caracciolo, and Mr. Joslin on charges of first-degree murder for the killing of Mr. Cohen (Count I), associating with a racketeering enterprise (the RICO charge) (Count II), conspiracy to commit first-degree murder (Count III), and unlawful use of a firearm during the commission of a felony (Count IV). Ms. Cohen was tried separately in 1989 and, as noted above, a jury found her guilty.

Following Ms. Cohen's guilty verdict, and after months of pretrial proceedings, the state offered Mr. Caracciolo a plea agreement; Mr. Caracciolo would plead nolo contendere (a) to a reduced charge of second-degree murder (Count I) for the killing of Mr. Cohen, and (b) to conspiracy to commit that murder (Count III), and receive a total sentence of 41 years in prison. In return, the state would agree to a nolle prosequi of the RICO and firearm charges. Michael Tarkoff, Esq., Mr. Caracciolo's counsel, advised Mr. Caracciolo that he was eligible for habitual offender status, and recommended that he accept the proposed plea agreement.

During the change of plea colloquy on October 3, 1991, Mr. Caracciolo told the trial court that "this is what I feel is best to do. It is not what I want to do but it is best to do it for myself." In response to a question from the court, Mr. Tarkoff agreed that the state could make out a prima facie case of guilt. The state subsequently proffered that Ms. Cohen had hired Mr. Caracciolo, Mr. Lamberti, and Frank Zuccarello to kill her husband; that on March 7, 1986, the three men went to the Cohen home; that Ms. Cohen gave Mr. Caracciolo a gun; and that Mr. Caracciolo used the gun to murder Mr. Cohen. The trial court did not ask Mr. Caracciolo whether he agreed or disagreed with the state's factual proffer. The trial court accepted the nolo contendere plea, and sentenced Mr. Caracciolo to 41 years in prison on Count I and 15 years in prison on Count III, with both sentences to run concurrently with each other and concurrently with a 27–year sentence that Mr. Caracciolo was already serving in an unrelated case.[2] Mr. Caracciolo was given credit for time served back to September of 1987.[3]

Mr. Caracciolo directly appealed his conviction, which was affirmed by Florida's Third District Court of Appeal. *See Caracciolo v. State,* 613 So.2d 35 (Fla. 3d DCA 1993) (table). In 1993, Mr. Caracciolo collaterally challenged his conviction under Florida Rule of Criminal Procedure 3.850. The trial court denied relief without a hearing, and the Third District affirmed. *See Caracciolo v. State,* 642 So.2d 1374 (Fla. 3d DCA 1994) (table). Mr. Caracciolo appealed this decision to the Florida Supreme Court, which ruled that it lacked

2. In a nolo contendere plea, the defendant "does not contest or admit guilt." BLACK's LAW DICTIONARY 1189 (8th ed.2004). In Florida, a "nolo plea means 'no contest,' not 'I confess.' It simply means that the defendant, for whatever reason, chooses not to contest the charge. He does not plead guilty or not guilty, and it does not function as such a plea." *Garron v. State,* 528 So.2d 353, 360 (Fla.1988).

3. As discussed later, Mr. Joslin also pled guilty to Mr. Cohen's murder, and received a sentence of 40 years.

jurisdiction and dismissed the appeal. *See Caracciolo v. State*, 649 So.2d 232 (Fla. 1994) (table). In 1995, Mr. Caracciolo filed his second Rule 3.850 motion for postconviction relief. The trial court again denied relief without a hearing, and the Third District again affirmed. *See Caracciolo v. State*, 678 So.2d 344 (Fla. 3d DCA 1996) (table). In 1997, Mr. Caracciolo filed this habeas corpus petition pursuant to 28 U.S.C.A. § 2254.

## II. The "Actual Innocence" Standard

Federal habeas petitioners generally cannot raise claims that were not first properly exhausted in state court. *See, e.g., Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir.1998). This exhaustion requirement flows from principles of comity, which protect the state courts' role in the enforcement of federal law and prevent disruption of state court proceedings. *See Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). As indicated in the prior order, Mr. Caracciolo procedurally defaulted on Claims IV and V.

 When a claim is procedurally defaulted, a federal habeas court may still address the merits if the petitioner shows cause for the default and actual prejudice from it, or demonstrates that the failure to consider the claim would result in a fundamental miscarriage of justice. *See Wainwright v. Sykes*, 433 U.S. 72, 81–88, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The burden is on the petitioner to prove that one of these exceptions applies and creates a gateway to overcome the procedural default. *See Engle v. Isaac*, 456 U.S. 107, 129, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *McCoy v. Newsome*, 953 F.2d 1252, 1258 (11th Cir.1992). One of the ways that a petitioner can establish manifest injustice and overcome a procedural bar is to show, by a preponderance of the evidence, that he is "actually innocent" (i.e., "factually innocent," not just "legally innocent") of the offense in question. *See Dretke v.*

*Haley*, 541 U.S. 386, 393, 124 S.Ct. 1847, 158 L.Ed.2d 659 (2004); *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). This formulation "ensures that [the] petitioner's case is truly 'extraordinary,' while still providing [the] petitioner a meaningful avenue by which to avoid a manifest injustice." *Schlup*, 513 U.S. at 327, 115 S.Ct. 851.

Several months ago, in *House*, the Supreme Court had an opportunity to further explain how the *Schlup* standard is to be applied following an evidentiary hearing. Its articulation of the standard bears quoting at length:

First, although "[t]o be credible" a gateway claim requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," the habeas court's analysis is not limited to such evidence.... [T]he habeas court must consider "all the evidence," old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial." Based on this total record, the court must make a "probabilistic determination about what reasonable, properly instructed jurors would do." The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the impact of the evidence on reasonable jurors. Second, it bears repeating that the *Schlup* standard is demanding and permits review only in the "extraordinary" case. At the same time, though, the *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence. *A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would have found him guilty beyond a*

*reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.* Finally, as the *Schlup* decision explains, the gateway actual innocence standard is "by no means equivalent to the standard of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)," which governs claims of insufficient evidence. When confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict. Because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires federal courts to assess how reasonable jurors would react to the overall, newly supplanted record. If new evidence so requires, this may include consideration of the "credibility of witnesses presented at trial."

*House,* 126 S.Ct. at 2077–78 (emphasis added, internal citations and quotation marks omitted, and original paragraph structure modified). A reasonable juror under *Schlup* is one "who fairly considers all of the evidence presented and conscientiously obeys the instructions of the trial court requiring proof beyond a reasonable doubt." *Davis v. Terry,* 465 F.3d 1249, 1251 n. 2, 2006 WL 2729606, *1 n. 2 (11th Cir.2006)

As if the actual innocence inquiry were not complicated enough, this case has an additional wrinkle. There is no trial record, and no jury verdict, because Mr. Caracciolo pled nolo contendere. There was also no post-conviction evidentiary hearing in state court. As Justice Scalia has explained, the plea scenario presents problems not only for the parties, but for the habeas court as well, in undertaking the actual innocence inquiry. *See Bousley v. United States,* 523 U.S. 614, 631, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (Scalia, J., dissenting) ("But how is the court to deter-mine 'actual innocence' upon our remand in the present case, where conviction was based upon an admission of guilt?"). In response to Justice Scalia's concerns, Supreme Court has instructed that, in a case like Mr. Caracciolo's, a habeas court may consider the factual proffer presented at the change of plea hearing as well as "any admissible evidence of [the] petitioner's guilt." *See id.* at 624 n. 3, 118 S.Ct. 1604. The Supreme Court has further held that, in a plea scenario, the petitioner must demonstrate actual innocence not only as to the offense(s) of conviction, but also as to "more serious charges" that have been dismissed or dropped in the course of plea bargaining. *See id.* at 624, 118 S.Ct. 1604 ("In cases where the government has foregone more serious charges in the course of plea bargaining, [the] petitioner's showing of actual innocence must also extend to those charges.").

### III. UNTANGLING A MURDER

The indictment against Ms. Cohen, Mr. Caracciolo, and Mr. Joslin was returned only after Mr. Zuccarello told detectives (while incarcerated on unrelated robbery charges) that he, Mr. Caracciolo, and Mr. Joslin—all of whom were members of a home-invasion gang—had been hired by Ms. Cohen to murder Mr. Cohen. Mr. Zuccarello said, among other things, that that Ms. Cohen met the trio at a North Miami Beach convenience store, gave them a map of her house, and opened the door for them on the night of the murder. Investigators later obtained corroborating statements (some under oath) from another member of the home-invasion gang, Jay Richitelli, who also implicated Mr. Caracciolo, Mr. Joslin, and Ms. Cohen in the murder.

It is sometimes difficult to figure out what happened in the past; it is really difficult when two decades separate the past from the present and when—as

here—many of those with purported first-hand knowledge of the relevant events have a vested interest in how the history is written and have changed their versions of events (sometimes more than once).[4] The evidence in the Cohen case is closer to a jumbled mess than a seamless web, and it has been a challenge to present it in some sort of coherent fashion. The best way I have come up with is to set out the evidence presented at Ms. Cohen's 1989 murder trial, and then summarize, usually by witness, the evidence presented at the 2005 evidentiary hearing.

## A. Ms. Cohen's 1989 Murder Trial

Mr. Cohen was killed in his upstairs bedroom by four shots from a .38 caliber handgun sometime after midnight on Friday, March 7, 1986. When the police arrived at the Cohen residence around 5:30 a.m., they found one of the panes of glass on a French door by the kitchen broken, with a rock nearby on the floor.

The state's theory at Ms. Cohen's trial was that Ms. Cohen wanted her husband dead because she wished to leave him but thought she would not obtain much money in a divorce. According to the state, Ms. Cohen hired Mr. Caracciolo, Mr. Joslin, and Mr. Zuccarello to kill her husband, and let the men into the house in the early morning hours of March 7 so they could carry out the murder. Mr. Caracciolo, according to the state's theory, was the one who shot and killed Mr. Cohen. The state further maintained that Ms. Cohen threw the murder weapon out of the house after wiping it clean, and invented a false story she told the police.

**Mr. Zuccarello.** Mr. Zuccarello was the state's main witness at Ms. Cohen's trial. His trial testimony is summarized below.

Mr. Zuccarello testified that initially Mr. Caracciolo told him and Mr. Joslin that they were going to carry out an armed robbery of the Cohen home, and that the gang drove by the residence in preparation for the invasion. But in February of 1986, the plans changed when he and Mr. Joslin accompanied Mr. Carraciolo to a 7–11 convenience store in North Miami Beach. At the 7–11, Mr. Caracciolo met with Ms. Cohen and a man named Lynn Barkley. Ms. Cohen and Mr. Barkley gave Mr. Caracciolo a piece of paper which turned out to be a rough sketch of the Cohen home. Mr. Caracciolo, Mr. Joslin, and Mr. Zuccarello then drove to Mr. Caracciolo's apartment in Hallandale (which is located in the southern part of Broward County). At the apartment, Mr. Caracciolo told the other two men that Ms. Cohen wanted her husband killed because she did not love him any more and would not receive anything in case of a divorce. The trio was to be paid for the killing once Ms. Cohen collected on her husband's insurance, but Mr. Caracciolo gave Mr. Zuccarello $2,500 and his black El Camino as partial payment.

Mr. Caracciolo also told Mr. Zuccarello that, in February of 1986, he—together with Mr. Joslin and Mr. Joslin's wife, Joy Ellefson—met Ms. Cohen at popular Coconut Grove nightclub called Biscayne Baby's. This meeting at Biscayne Baby's, according to Mr. Zuccarello, took place within a week of the meeting at the 7–11.

Mr. Caracciolo informed Mr. Zuccarello that the plan for the murder included having the alarm system turned off at the Cohen home. All three men had specific roles in the planned murder, which was supposed to take place between 1:00 a.m.

---

4. The ease with which some of the witnesses have changed their stories brings to mind a line penned by Lord Byron in one of his famous works: "After all, what is a lie? 'Tis but the truth in masquerade.'" George Gordon, Lord Byron, Don Juan, Canto XI, stanza 37 (1823).

and 3:00 a.m. Mr. Zuccarello was to act as the lookout; Mr. Joslin was to make the whole thing look like a burglary by breaking a plane of glass; and Mr. Caracciolo was to shoot Mr. Cohen. Ms. Cohen was going to let the men in the house, and supply Mr. Caracciolo with the murder weapon at that time. The weapon was supposed to be Mr. Cohen's own gun because the trio was going to make it look like a botched burglary in which the burglar took the gun away from Mr. Cohen and shot him. Another part of the plan was for Ms. Cohen to claim that she and her husband had been arguing—as they had done in the past—and that therefore she was not sleeping with him at the time of the murder.

On the morning of March 6, 1986, Mr. Caracciolo told Mr. Zuccarello that he had received the go-ahead from Ms. Cohen—by way of a call to a telephone booth in Hallandale—and that the murder was to take place that night. According to Mr. Zuccarello, on March 7, 1986, just past 1:00 a.m., he, Mr. Caracciolo, and Mr. Joslin—each one armed and wearing gloves—left Mr. Caracciolo's apartment in Hallandale and drove to Coconut Grove in the black El Camino. When they arrived at the Cohen home at just past 2:00 a.m.—Mr. Zucarello said he knew the time because he had looked at a digital clock that had been placed near the speedometer of the El Camino, and the clock said 2:08 a.m.—Ms. Cohen opened the door and let them in. She said "hurry up, get it over with."

Ms. Cohen left with Mr. Joslin and walked through the living room to the back. Mr. Zuccarello, instead of staying by the front door, went upstairs after a while. While going up the stairs, he heard several shots, and saw Mr. Caracciolo in the bedroom with a gun in his hand. Mr. Zuccarello ran downstairs, heard a couple of more shots, exited the house, and got into the car. Mr. Joslin (who went out the side or back door) and Mr. Caracciolo (who went out the front door) then got into the car. Mr. Caracciolo, who was not holding a gun, was angry at Mr. Zuccarello for having made him panic. Mr. Caracciolo told Mr. Zuccarello that he thought he missed with one shot, that he had run out of the house, and that he did not remember what he did with the murder weapon. According to Mr. Zuccarello, they were in the Cohen home about five to ten minutes.

Mr. Zuccarello was impeached at trial with his participation in the home invasion gang, his prior criminal history, and his cocaine use. But the impeachment did not stop there. Mr. Zuccarello was impeached on many other grounds, the most important of which are related below.

First, Mr. Zuccarello received use and derivative use immunity for statements and information he gave to the police concerning the Cohen murder. As a result, he was never charged for his role in that murder. Pursuant to a plea agreement in Dade County, he was sentenced to only five years in prison and five years of probation for conspiracy to commit armed robbery—even though he was 17–22 years for robberies in Dade County—and served only two years of that sentence (so that by the time of Ms. Cohen's trial he was out of prison).[5] Although Mr. Zuccarello testified at trial that he was not required to testify at Ms. Cohen's trial in exchange for the lenient treatment he received, the jury had enough evidence to believe otherwise, and to conclude—if it chose—that Mr.

---

5. Mr. Zuccarello also pled guilty to some charges in Broward County, again pursuant to a plea agreement, and was ultimately sentenced to five years in prison, to run concur-rently with the sentence imposed in Dade County. Mr. Zuccarello had faced life imprisonment in Broward County.

Zuccarello was framing Ms. Cohen (and Mr. Caracciolo and Mr. Joslin) to save himself from a lengthy sentence for his role in the robberies and fulfill his end of the bargain with the authorities.[6] Indeed, while cooperating with the authorities (and while incarcerated), the police gave him certain other significant benefits and perks, such as routinely checking him out of jail and taking him to eat at local establishments, transporting him to his grandmother's home, taking him to his girlfriend's house a couple of times (during which Mr. Caracciolo and his girlfriend had sex), going to a barbershop to get a haircut, and visiting the Miami Dolphins' practice facility. According to Mr. Zuccarello, these get-out-of-jail trips numbered around 60.

Second, Mr. Zuccarello admitted during cross-examination at trial that he had lied to the police on various occasions, and his trial testimony on various matters was inconsistent with statements he had previously given to the authorities: (a) he initially lied to the police about his participation in the robberies (b) he lied several times to the police about his involvement in the Cohen murder (e.g., by denying that he had been at the Cohen home at the time of the murder); (c) he told the police both that he saw Mr. Cohen get shot and that he did not see Mr. Cohen get shot; (d) at his deposition he denying telling the police that Ms. Cohen had called Mr. Caracciolo at his apartment five times, yet at trial he said that those phone calls had in fact been made; (e) he testified at trial that he had told the police that he initially did not want to be involved in the Cohen murder, but at his deposition he denied making such a statement; (f) at his deposition he de-

nied telling the police that Mr. Caracciolo had showed him a diagram or sketch of the Cohen home; (g) he had initially told the police that when Mr. Caracciolo came out of the Cohen home, he was carrying a pillowcase which he (Mr. Zuccarello) believed contained cocaine; (h) he first told the police that he did not know who had actually shot Mr. Cohen; (i) in testimony at a prior trial, involving charges against one of the members of the home-invasion gang, he had testified that he had bought the El Camino from Mr. Caracciolo for $2,000 (which contradicted his testimony at Ms. Cohen's trial that the El Camino was given to him by Mr. Caracciolo as partial payment for the Cohen murder);[7] (j) he initially told the police he did not know how many shots had been fired at the Cohen home; (k) he initially told police that he and the others were going to get paid for the Cohen murder within days; (l) at his deposition he incorrectly stated that the stairs in the Cohen home were to the right; (m) he testified at trial that Mr. Caracciolo met Ms. Cohen through another woman, but in an earlier statement to the police he said that he did not know how the two met; (n) his testimony at trial as to when he had first met Ms. Cohen (i.e., at the meeting at the 7–11) was inconsistent with prior statements he had given to the police (i.e., that he had first met Ms. Cohen through Mr. Caracciolo at a Coconut Grove bar); (o) in one of his statements to the police, Mr. Zuccarello said that he did not see Mr. Caracciolo with a gun (though he explained at trial that he thought he was just being asked whether he saw Ms. Cohen give Mr. Caracciolo a gun); (p) he was inconsistent as to what he was ultimately supposed to be paid

---

6. Mr. Zuccarello testified that he cooperated with the police in other murder investigations, including one in Kentucky and another in Hallandale.

7. Mr. Zuccarello testified at trial that he and Mr. Caracciolo came up with the $2,000 figure for tax purposes on the transfer of the El Camino.

for the Cohen murder ($100,000, or $150,000, or cocaine); and (q) while incarcerated on the home-invasion charges, he saw television news coverage of the Cohen murder and pictures of Ms. Cohen (thereby allowing the defense to suggest that he had made up his story from the news coverage). With respect to these inconsistencies, Mr. Zuccarello explained on redirect that he had spoken to about 75 officers prior to the time he told the police the truth about the murder in June of 1986, and that he had always been consistent about Ms. Cohen, Mr. Caracciolo, and Mr. Joslin being involved in the killing.

In addition to Mr. Zuccarello's testimony, three critical matters during Ms. Cohen's trial were the murder weapon and Ms. Cohen's connection to it, the time of death, and Ms. Cohen's alleged motive for wanting her husband killed and involvement in the murder. The evidence on those issues is summarized below.

THE GUN. In the course of their investigation, the police located the murder weapon in the foliage outside the front porch of the Cohen home. Two pieces of white tissue were stuck between the grip and the hammer of the gun. Inside the house, the police found an empty tissue box in a wastebasket below a sink. Underneath the box were white tissues with a blue flower pattern. Two of the tissues were impounded and tested. One had mucus with Type B blood (the blood type of Ms. Cohen and of 15% of the population), while the other had lead particles consistent with gunshot residue. A swab of Ms. Cohen's hands also showed gunshot residue. The state's gunshot residue expert, Gonipath Rao, testified that Ms. Cohen had not fired a gun, but had handled a gun which had recently been fired, and that the tissue with the lead particles was consistent with Ms. Cohen handling the gun and wiping it down.

THE TIME OF DEATH. Aside from Mr. Zuccarello's testimony, the evidence at Ms. Cohen's trial concerning the exact time of death was conflicting.

One of the state's experts, Dr. Charles Welti, initially opined that Mr. Cohen died between midnight and 6:00 a.m. But he changed his opinion right before trial and ultimately placed the time of death at between 1:30 a.m. and 3:30 a.m. based on lividity he observed on slides taken from Mr. Cohen. On the other hand, Dr. Michael Baden, one of Ms. Cohen's forensic experts, testified that he did not see any lividity on the slides. He opined that Mr. Cohen died shortly before 5:30 a.m., and not before 5:00 a.m.

Three paramedics who responded to the scene testified that Mr. Cohen's body was warm to the touch and that they did not see any lividity (though they were not looking for it). Two police officers who were at the scene with the paramedics likewise testified that they did not observe any lividity on the body, but one police officer said he saw a small area of lividity around one of Mr. Cohen's armpits.

Bernard Auhouse, a neighbor of the Cohens, testified that he was awakened by four gunshots at around 3:00 a.m. But another neighbor, Jerry Mandina, who lived just 75–100 feet way and was awake doing work, testified that he did not hear any gunshots at that time. Instead, Mr. Mandina said he heard a loud noise (like a door being slammed or kicked in) simultaneously with the sound of falling glass, at around 5:00 a.m. followed by an alarm going off about five minutes later.

MS. COHEN'S STATEMENTS AND EVIDENCE OF HER INVOLVEMENT. The state presented evidence from various witnesses that Ms. Cohen was frustrated with her marriage and believed that she would not receive anything if she divorced her husband; that Mr. Cohen had an affair with another

woman (Carol Hughes) in January and February of 1986; and that Ms. Cohen knew of the affair prior to the murder. An acquaintance, Frank Wheatly, testified that Ms. Cohen told him she wished she knew someone who could kill her husband.

Ms. Cohen did not testify at trial. The state, however, introduced statements she had given to the police.

Ms. Cohen told the police that she and her husband had gone to bed around 12:30 a.m. At around 1:15 a.m., Ms. Cohen said she went downstairs to get water. She thought she heard a noise—the latch from the outside gate—and called for Mr. Cohen to come downstairs. Mr. Cohen came down with a gun, and the two of them went outside to make sure everything was fine. They found the latch and the gate open.

The Cohens returned inside and went back upstairs. Ms. Cohen said she could not sleep, however, and so she went back downstairs, to a room on one side of the kitchen, to sort through her son's papers and belongings for a garage/yard sale. Ms. Cohen did not turn the alarm system back on because she did not want it to go off due to her moving around the house.

Sometime later, while downstairs, Ms. Cohen said she heard a loud noise from the other side of the house, and opened the door of the room she was in to let the dog inside. The dog went into the kitchen, and Ms. Cohen followed. When she saw that the door to the kitchen was open, she searched for the keys to activate the alarm, turned on the alarm (which notified the authorities), and called the police. At that time, a friend of Ms. Cohen's, Kimberly Carroll, called from Colorado. Ms. Cohen told Ms. Carroll she could not talk, and proceeded towards the upstairs bed-

room.[8] It was dark, and loud (because alarm was sounding), but she saw two men running down the stairs; one of the men said to the other "Fuck, let's get out of here." Ms. Cohen then saw one person going out the front door, and continued upstairs, where she found Mr. Cohen in the bedroom bleeding.

The state presented evidence that, prior to the murder, Ms. Cohen was seen with Mr. Caracciolo and Mr. Joslin at Biscayne Baby's. Anthony Middleton, who worked as the floor manager at Biscayne Baby's in the mid–1980s, testified that he knew Ms. Cohen because she visited the nightclub about two to three times a week for several months. One night in February of 1986, Mr. Middleton saw Ms. Cohen, Mr. Caracciolo, Mr. Joslin, and Josephine Macaluso (Mr. Caracciolo's girlfriend) in the champagne room at Biscayne Baby's. Mr. Middleton remembered these individuals because he had tripped and spilled drinks on them. He explained, however, that he did not see Ms. Cohen talking to Mr. Caracciolo or Mr. Joslin in the champagne room.

### B. The Palombo Home Invasion

It is undisputed that Mr. Carraciolo, Mr. Zuccarello, Mr. Joslin, Jay Richitelli, Scott Richitelli, and possibly others (e.g., Richie Ferraro) were members of an armed home-invasion gang which committed two to three dozen robberies (usually of suspected drug dealers based on inside information) in Dade and Broward Counties in 1985 and 1986. Florida Department of Law Enforcement Agent Steven Emerson interviewed many of the individuals who were suspected of being members of the gang, including Mr. Zuccarello, Jay Richitelli, and Mr. Caracciolo. Agent Emerson found Mr. Zuccarello to be reliable, and he was able to corroborate most of the infor-

---

8. In a second statement given to the police, Ms. Cohen said that she heard the noise while on the phone with Ms. Carroll.

mation provided by Mr. Zuccarello. Agent Emerson was also able to corroborate the information given to him by Mr. Caracciolo. Mr. Caracciolo ultimately confessed to his involvement in a "large number" of armed robberies and armed home invasions, some of which involved tying up and/or kidnaping victims and using police badges and uniforms. At least one of the robberies, moreover, included a sexual assault. Mr. Caracciolo faced the possibility of life in prison for his role in these armed home invasions.[9]

One of the gang's armed home invasions involved the residence of a jeweler named Palombo in Lighthouse Point near Pompano Beach around the time of the Cohen murder.[10] This robbery is significant because the gang first attempted to commit it on the morning of March 7, 2006, the day Mr. Cohen was murdered. Like much of the evidence presented at the hearing, however, the testimony about this attempted robbery was not consistent on critical details.

The Palombo robbery took place on Monday, March 10, 1986, three days after the Cohen murder. According to Mr. Caracciolo, the gang (Mr. Zuccarello, Mr. Caracciolo, and Jay Richitelli) conducted surveillance of the Palombo residence on Thursday, March 6, 1986. According to Jay Richitelli and Mr. Joslin, the gang initially planned to commit the robbery the next day, March 7—the day of the Cohen murder.

On March 7, according to Jay Richitelli, the gang—whose members were staying at Mr. Caracciolo's apartment in Hallandale,

in Broward County—got up at around 4:00 or 5:00 a.m., and drove to the Palombo residence, arriving there at 5:30 to 6:00 a.m. Because no one was home, however, the gang left, deciding to try again the following Monday. On March 10, the gang returned, entered the residence, tied up the elderly Mr. Palombo, and beat him because he would not disclose where the safe was. One member of the gang (it is unclear who) put a gun in the mouth of Mrs. Palombo. The gang left without finding the safe, but took some jewelry and watches. Mr. Zuccarello was arrested the following night.

Mr. Joslin also testified about the Palombo robbery at the evidentiary hearing. His recollection of some of the events, however, differed in significant respects from that of Jay Richitelli. For example, Mr. Joslin could not remember whether the gang stayed overnight at Mr. Caracciolo's apartment in Hallandale on March 6–March 7. He also testified that on March 7 the gang arrived at the Palombo residence around 10 a.m. to 12 noon—about four to six hours later than Mr. Richitelli had placed the arrival.[11]

When Mr. Caracciolo was asked about the Palombo robbery at the evidentiary hearing, his testimony was not completely consistent with the versions given by Jay Richitelli and/or Mr. Joslin. Mr. Caracciolo testified that, on the morning of March 6, 1986, he, Jay Richitelli, and Mr. Joslin conducted surveillance at the Palombo residence. The gang needed the Palombos inside at the time of the robbery so

---

**9.** Scott Richitelli admitted at the hearing that, although not convicted of them, he was involved in two to three dozen armed home invasion robberies in 1985 and 1986 with his brother Jay, Mr. Zucarello, and Mr. Caracciolo.

**10.** Pompano Beach is in Broward County.

**11.** If Mr. Joslin's testimony about the events on March 7, 1986, is credited, then Mr. Caracciolo would have had enough time to kill Mr. Cohen between 3:00 a.m. and 5:00 a.m. in Coconut Grove, drive to his apartment in Hallandale, meet up with the other members of the gang, and get to the Palombo residence in Lighthouse Point between 10:00 a.m. and 12 noon.

that the couple could help them locate and open the safe, and were trying to determine the best time for the home invasion. That night, after going to dinner in North Miami, Mr. Caracciolo, Michelle Slattery (Mr. Zuccarello's girlfriend), and Mr. Joslin returned to Mr. Caracciolo's apartment in Hallandale around 11:30 p.m. Mr. Zuccarello had chosen not to go to dinner and had stayed behind in the apartment. Mr. Caracciolo fell asleep. At around 5:30 a.m. on March 7, Jay Richitelli called about the Palombo home invasion.[12] Mr. Caracciolo, Mr. Joslin, and Mr. Zuccarello picked up Mr. Richitelli in Oakland Park (also located in Broward County) and headed to Lighthouse Point, where they arrived around 8:00 a.m. The gang intended to carry out the robbery that day, but no one was at the Palombo residence, so the four men left to go have breakfast, and returned to Mr. Caracciolo's apartment around 10:30 a.m.

Mr. Caracciolo's testimony at the hearing about the Palombo robbery also conflicted in part with statements he had given in the past. For example, in December of 1986, Mr. Caracciolo told Agent Emerson that on the morning of March 7 he met Mr. Zucarello at his (Mr. Caracciolo's) apartment in Hallandale; that the two of them then went to pick up Mr. Joslin; and that the three of them then went to pick up Jay Richitelli. If this earlier statement was truthful, then Mr. Caracciolo was alone in his apartment with Ms. Slattery, on the night of March 6 and the early morning hours of March 7. That would mean that only Ms. Slattery could provide an alibi for Mr. Caracciolo.

Significantly, Mr. Zuccarello testified at the hearing that, at the time of the Palombo robbery, he was not staying with Mr. Caracciolo and Ms. Slattery. This testimony, at least in part, suggests that Mr. Caracciolo's 1986 version of events might be more credible.

### C. Mr. Caracciolo

At the evidentiary hearing, and in his affidavit, Mr. Caracciolo denied having shot Mr. Cohen or otherwise being involved in the murder. He maintained that Mr. Zuccarello's version of events was false. As noted above, Mr. Caracciolo testified that he was at his apartment, sleeping, with Mr. Zuccarello and Michelle Slattery, from 11:30 p.m. on March 6 to around 5:30 a.m. on March 7.

There was evidence, however, that Mr. Caracciolo had previously admitted to others his involvement in the murder and/or made statements that were incriminating. Mr. Caracciolo denied making these statements or sought to explain or downplay what he said.

There was evidence that, in August of 1987, at the Dade County Jail, Mr. Caracciolo told an inmate named Daniel Jones (an inmate clerk he had approached for legal help) that he, Mr. Zuccarello, and another individual had been paid a large sum to commit the Cohen murder; that Ms. Cohen had wanted her husband killed because she was trying to get out of the marriage; and that all three men had shot Mr. Cohen.[13] Mr. Caracciolo denied making any such statements to Mr. Jones.

There was also evidence that Mr. Caracciolo told an inmate named James Taylor

---

12. If Mr. Caracciolo's testimony on this point is credited, then Jay Richitelli did not stay overnight at Mr. Caracciolo's apartment on March 6–March 7. This would mean that Jay Richitelli was not telling the truth, and that he could not provide an alibi for Mr. Caracciolo prior to 5:30 a.m.

13. A copy of Mr. Jones' letter (with a envelope post mark of October 31, 1989) to prosecutors in the Cohen case setting out Mr. Caracciolo's statements was introduced at the hearing.

in a series of conversations in 1987 that he had been involved in the Cohen murder, and had been in the Cohen bedroom "taking care of the old man" while "Frank" was downstairs with Ms. Cohen. According to Mr. Taylor's letters to the police, copies of which were introduced at the hearing, Mr. Caracciolo said he was not scared because the police did not have enough evidence against him. At the hearing, Mr. Caracciolo denied having admitted his participation to Mr. Taylor, but conceded that he had shown Mr. Taylor a newspaper clipping about the Cohen murder as an "embellishment." Mr. Caracciolo also acknowledged that, by the time he entered his plea, Mr. Taylor had been deposed and had testified about Mr. Caracciolo's allegedly incriminating statements. Mr. Taylor's deposition was introduced at the hearing, as was evidence that Mr. Taylor had failed a polygraph. Again, aside from the so-called "embellishment," Mr. Caracciolo denied making incriminating statements to Mr. Taylor.

Mr. Caracciolo also made incriminating statements to the police. In April of 1986, as part of their investigation on the home invasions, Detectives Randy Baker and Joe Gross drove Mr. Caracciolo to the Cohen home. While parked at the home, and in response to questions by Detective Baker (without any advice of rights being given), Mr. Caracciolo admitted that he had been in the Cohen home and that he had killed Mr. Cohen. After making these statements, however, Mr. Caracciolo retracted them, saying "Boy, you guys must be dreaming." Detective Baker thought these were serious admissions by Mr. Caracciolo, while Detective Gross did not. Mr. Caracciolo entered his nolo contendere plea before a suppression hearing as to these statements was held.

As noted earlier, FDLE Agent Steven Emerson investigated a series of home invasion robberies in Broward County in the late 1980s. He did not specifically interview Mr. Caracciolo about Mr. Cohen's murder. Prior to Mr. Caracciolo's nolo contendere plea, however, Agent Emerson asked Mr. Caracciolo if he killed Mr. Cohen, and Mr. Caracciolo said no. Agent Emerson suggested to Mr. Caracciolo that he not plead to the Cohen murder if he was not in fact guilty, and suggested a polygraph. Mr. Caracciolo agreed to take a polygraph, and Agent Emerson informed the authorities investigating the Cohen murder about Mr. Caracciolo's offer to take a polygraph. According to Agent Emerson, they never followed up on the offer.

### D. MR. JOSLIN

Although he pled guilty to the Cohen murder, and received a sentence of 40 years, Mr. Joslin testified at the hearing that he was not involved in the killing. He also ratified his 1993 affidavit, in which he said (among other things) that he had never met Ms. Cohen or been to the Cohen home, that he did not go to a meeting about the murder at a 7–11, and that Mr. Caracciolo never discussed the murder of Mr. Cohen with him. He further testified at the hearing that the El Camino did not have a digital clock, as Mr. Zuccarello had said. He explained that he entered a plea to the murder because his back was against the wall and because the state offered him a sentence that would run concurrent with his sentence for the armed home invasions. He had offered to take a polygraph, and to allow the state to use any adverse results against him, but the state declined his offer. Agent Emerson, who was investigating the armed home invasions in Broward County, testified that Mr. Joslin told him that he knew nothing about the Cohen murder.

Mr. Joslin, however, has not been consistent in his story. There was evidence at the hearing showing that, on several occa-

sions in the past, Mr. Joslin had admitted his participation in the Cohen murder.

First, there was evidence that Mr. Joslin told an inmate named Ramon Gonzalez that he had driven the car in the Cohen murder. Mr. Joslin, for his part, denied making any such statement to Mr. Gonzalez.

Second, in August of 1989 Mr. Joslin told Detective Jorge Cadavid that he had staged the burglary in the Cohen home and stayed in the car while the murder was committed. He offered to testify against Ms. Cohen at her trial, explaining to authorities that two to three weeks before the murder he and Mr. Caracciolo had met Ms. Cohen at Biscayne Baby's to discuss the hit, and that Mr. Caracciolo had been the shooter. He also told Detective Cadavid that Mr. Caracciolo had offered him $200,000 for an alibi and had told him that Ms. Cohen had been careless (because she did not throw the gun far enough away and because there was tissue paper on the gun). At the hearing Mr. Joslin admitted having made these statements to Detective Cadavid but said that he made them only because he wanted to get out of jail and was willing to tell the police what they wanted to hear.

Third, when he fled South Florida after the Cohen murder, Mr. Joslin ended up in California. There was evidence at the hearing that, in September of 1986, he told one of his roommates—a man named Wally Masters—that not only had he been involved in a series of robberies of drug dealers, he had also been involved with others in the murder of an older gentleman in Coconut Grove (but had not been the shooter).[14] At the hearing, Mr. Joslin denied having confessed to Mr. Masters. Yet another acquaintance of Mr. Joslin's in California, David Alford, also testified in a

1990 deposition that Mr. Joslin had admitted being involved, as the driver, in a cocaine murder with two other people he did not name.

In addition, Mr. Joslin admitted to other matters which supported, at least in part, the state's theory of the murder. For example, he did not deny being at a 7–11 in North Miami Beach with Mr. Caracciolo for a meeting concerning an upcoming crime. He said, however, that this meeting—which was with Josephine Macaluso, Mr. Caracciolo's girlfriend—was for the purpose of setting up a hit on a Colombian drug dealer (and not to arrange the Cohen murder). In addition, he admitted that he had been to Biscayne Baby's once with Mr. Caracciolo.

### E. THE RICHITELLIS

Scott Richitelli testified at the hearing that, before Ms. Cohen's trial, he spoke to Mr. Zuccarello at the South Florida Reception Center. Mr. Zuccarello first accused Jay Richitelli of being the shooter in the Cohen murder, and then said he wanted to get at Mr. Caracciolo because he thought Mr. Caracciolo was fooling around with his girlfriend, Michelle Slattery. Mr. Zuccarello also said he was in Lighthouse Point the night of the murder, and not present at the Cohen home, but that he was going to do anything to get a deal. Mr. Zuccarello encouraged the Richitellis (Scott and his brother Jay) to "jump on the bandwagon" and point the finger at Mr. Caracciolo. Scott Richitelli said he knew his brother Jay was going to join Mr. Zuccarello in accusing Mr. Caracciolo.

Scott Richitelli, however, was not what one would call a generally impartial or believable witness. He had a grudge against Mr. Zuccarello because his own

---

**14.** The police and prosecutors investigating the Cohen murder interviewed Mr. Masters in California in March of 1988, prior to Ms. Cohen's trial and Mr. Caracciolo's plea. The transcript of this interview was one of the state's exhibits at the hearing.

arrest in 1986 had been a result of Mr. Zuccarello "squealing." Scott Richitelli also admitted being involved in two to three dozen home invasion robberies in 1985–1986 with his brother Jay, Mr. Caracciolo, and Mr. Zuccarello.

Jay Richitelli, like his brother, testified at the hearing that Mr. Zuccarello had urged him to frame Mr. Caracciolo in the Cohen murder, and had asked him to try to learn specific facts about the murder.[15] Jay Richitelli said that, in February or March of 1987, the prosecutors in the Cohen murder case—John Kasternakes and Kevin DiGregory—left him alone for 20–30 minutes in a room at the state attorney's office with the files of the Cohen case, while they went to go get lunch, so that he could learn the details of the case; they supposedly wanted him to corroborate Mr. Zuccarello's story because they did not have enough evidence against Ms. Cohen.[16] According to Jay Richitelli, the prosecutors told him "We're stepping out; here's the Cohen file—help yourself." The prosecutors left the door to the room locked when they left, and two female secretaries stayed outside the room, ostensibly guarding Jay Richitelli. Later on, after he had learned about the case, the prosecutors "schooled" him on what questions they would ask him if he testified against Ms. Cohen, Mr. Caracciolo, or Mr. Joslin.

Yet on five prior occasions—two under oath—Jay Richitelli had implicated Mr. Caracciolo in the Cohen murder, and had passed two polygraph examinations. First, he gave a proffer through his attorney in October of 1986 identifying Mr. Caracciolo as the shooter. When asked at the hearing whether he lied in that proffer, he asserted his Fifth Amendment privilege against self-incrimination. Second, he told Detective John Spear in November of 1986 that Mr. Caracciolo had, after the Palombo robbery, confessed to him that he had killed Mr. Cohen and that Ms. Cohen had opened the door and turned off the alarm. Third, he implicated Mr. Caracciolo and Mr. Joslin in his 1987 sworn statement, which was given prior to Ms. Cohen's trial. When asked at the hearing about the veracity of that 1987 statement—a copy of which was introduced as an exhibit—he again asserted his Fifth Amendment privilege against self-incrimination. According to the transcript of this sworn statement, Jay Richitelli told the prosecutors in 1987(1) that Mr. Caracciolo had told him and Mr. Joslin that Ms. Cohen wanted her husband killed; (2) that the plan was for Ms. Cohen to let the killers into the house on the night of the murder; (3) that Mr. Caracciolo asked him to be involved but he declined, so Mr. Caracciolo decided to ask Mr. Zuccarello; (4) that Mr. Caracciolo told him that each of the men (Mr. Caracciolo, Mr. Joslin, and Mr. Zuccarello) had shot Mr. Cohen once; and (5) that in 1986, while incarcerated together, Mr. Caracciolo told him that he was going to be testifying against him and his brother Scott on the home invasions, to which Jay Richitelli replied that if he did, he would testify against him on the Cohen murder. Fourth, in 1987, at a polygraph examination, he stated that Mr. Caracciolo had told him that he had killed Mr. Cohen. Fifth, in 1989, when he was deposed by Ms. Cohen's counsel, he testified that Mr. Caracciolo had admitted to him that he and others had gone to "whack" Mr. Cohen.

Putting aside these prior statements implicating Mr. Caracciolo, Jay Richitelli cannot exonerate Mr. Caracciolo. As he acknowledged at the hearing, even if his current version of events is believed, he

---

**15.** In 1994, Jay Richitelli was sentenced to a 40–year prison term for violation of his probation.

**16.** The Cohen case files numbered 25 banker's boxes.

has no personal knowledge as to whether Mr. Caracciolo was involved in the Cohen murder, because he did not see Mr. Caracciolo until about 5:30 a.m. on March 7, 1986.

### F. MR. ZUCARELLO

Mr. Zuccarello testified at the hearing, and essentially repeated his trial testimony about the Cohen murder and Mr. Caracciolo's participation in it. He denied having been shown the case files by the police or the prosecutors, and denied having told others (such as private investigator Eric Zeid, whose testimony is summarized below) that he had lied about the Cohen murder.

Not surprisingly, there was a lot of testimony at the hearing about Mr. Zucarello's general credibility and reliability. That evidence is described in the following paragraphs.

Agent Emerson found Mr. Zucarello to be reliable and credible with respect to the information he provided about the armed home invasions. According to Agent Emerson, Mr. Zucarello was also the first to disclose the meeting between Ms. Cohen and Mr. Caracciolo at Biscayne Baby's prior to the murder. On the other hand, Agent Emerson stated in a 1993 affidavit that he was not able to corroborate the details about the Cohen murder provided by Mr. Zuccarello, except for the time of death. He therefore told the prosecutors that he would avoid using Mr. Zuccarello due to his lack of reliability. To provide context, it is important to keep in mind that Agent Emerson was investigating a series of home invasions, and spent, by his own admission, little time on the Cohen case. He also testified that he had not specifically interviewed Mr. Zuccarello about Mr. Cohen's murder, that he did not know if other police officers or prosecutors were able to corroborate Mr. Zuccarello's statements, and that his recommendation

to the prosecutors was based on a gut feeling.

Warren Holmes, a polygrapher, testified that he administered a polygraph examination to Mr. Zuccarello in June of 1986 concerning the armed home invasions. According to Mr. Holmes, Mr. Zuccarello did not mention any involvement in the Cohen murder during his pre-polygraph interview. During the ensuing examination, Mr. Zuccarello refused to answer questions about the Cohen murder. On more than one occasion Mr. Holmes told the prosecutors in the Cohen case that he had concerns about the credibility of Mr. Zuccarello, whom he believed was duping the authorities. Mr. Holmes told the prosecutors that, in his opinion, they would be suborning perjury if they called Mr. Zuccarello as a witness.

But, as with many other witnesses in this case, Mr. Holmes' testimony was not without its problems. For starters, when he was deposed in September of 1989 in the Cohen case, Mr. Holmes testified that there were no restrictions on questions that he was able to ask Mr. Zuccarello in the pre-polygraph interview. And in his report of the polygraph examination, Mr. Holmes wrote that, in his pre-polygraph interview, Mr. Zuccarello had said that he had knowledge about several homicides, including the Cohen murder. This, at least in part, undercuts the implication that Mr. Zuccarello did not want to say anything to Mr. Holmes about the Cohen murder at the time of the polygraph examination. Indeed, the report also states that Mr. Zuccarello mentioned Mr. Barkley (the man who supposedly went with Ms. Cohen to the 7–11 in North Miami Beach to meet Mr. Caracciolo) in the interview. Furthermore, it is not clear that Mr. Holmes even had the authority to polygraph Mr. Zuccarello about the Cohen murder. Mr. Holmes admitted at the

hearing that Detective Joseph Gross, who brought Mr. Zuccarello in for the polygraph, may have told him (Mr. Holmes) not to ask any questions about the Cohen murder because that was not his case and he did not have the authority to approve a polygraph on that case. Finally, Mr. Holmes' report states that Mr. Zuccarello's answers were truthful with respect to the home invasions.

Eric Zeid, a private investigator, testified at the hearing about numerous conversations he had with Mr. Zuccarello. He spoke four times to Mr. Zuccarello in late June and early July of 1996, twice by phone and twice in person. He told Mr. Zuccarello that he was working on the cases of, and trying to help, Mr Caracciolo, Mr. Joslin, and Ms. Cohen. Although Mr. Zuccarello admitted that he had made inconsistent statements about his involvement in other cases, he maintained that he had been truthful about the Cohen murder. In mid-July of 1996, Mr. Zeid spoke to Mr. Zuccarello a fifth time. During this meeting, Mr. Zeid told Mr. Zuccarello of inconsistencies in the Cohen case and talked to him about recanting his statements. According to Mr. Zeid, Mr. Zuccarello told him that he "wanted to do the right thing," but needed to talk to an attorney and to Michelle Slattery. Mr. Zeid thought this was a tacit admission, but conceded at the hearing that Mr. Zuccarello never said he had been untruthful. Working with the approval of the Broward Sheriff's Office, specifically Major Anthony Fantigrassi, Mr. Zeid put Mr. Zuccarello in contact with Ms. Slattery.

In August of 1998, Mr. Zeid spoke two more times to Mr. Zuccarello. The second of these conversations was recorded (with the approval of Major Fantigrassi and without the knowledge of Mr. Zuccarello), and introduced at the hearing. Mr. Zuccarello indicated a willingness to tell the truth and made certain ambiguous state-

ments, such as "I'm trying to help you with your agenda," "I'm going to do it," "I want to do the right thing," and "I want to tell the truth." Although Mr. Zeid believed that Mr. Zuccarello admitted lying, he acknowledged at the hearing that Mr. Zuccarello never came out and admitted that he had lied about the Cohen murder.

Mr. Zuccarello told prosecutors that Ms. Cohen's counsel had offered him a bribe in 1998 (around the time that Mr. Zeid was talking to him about changing his testimony). But he did not tell prosecutors about the alleged bribe until 2005.

### G. THE HODACK MURDER INVESTIGATION

There was a fair amount of testimony at the hearing concerning a separate murder—the 1984 murder of Carl Hodack, an informant for the Bureau of Alcohol, Tobacco, and Firearms, in Broward County, Florida—that was under investigation prior to Ms. Cohen's trial. In 1988, the Hodack murder was being investigated by, among others, Major (then Captain) Anthony Fantigrassi of the Broward Sheriff's Office. In the course of his investigation, Major Fantigrassi interviewed various individuals, including Mr. Zuccarello. Ultimately, the authorities indicated Richard Delgadio in July of 1996 for Mr. Hodack's murder, based in part on the testimony of Mr. Joslin, who was with Mr. Hodack when he was shot.

Major Fantigrassi testified that Mr. Zuccarello falsely implicated Mr. Joslin's father, Donald Lamberti, in the Hodack murder (as well as Mr. Joslin to a lesser extent), and later admitted his false testimony. Mr. Zuccarello, however, never told Major Fantigrassi that he had lied about the Cohen murder. Major Fantigrassi says that he told the Cohen prosecutors (Kevin DiGregory and John Kasternakes) in July of 1988 about Mr. Zuccarello's false testimony in the Hodack case.

Mr. Zuccarello testified differently than Major Fantigrassi. He said that he told the BSO that Donald Lamberti was "involved" in the Hodack murder, but was not sure if he said that Mr. Lamberti was the shooter. He also said that the information he provided on the Hodack murder came from Mr. Lamberti's son, Mr. Joslin.

Major Fantigrassi met with Abraham Laeser (the supervisor of Mr. DiGregory and Mr. Kasternakes at the state attorney's office) sometime around 1997, after Mr. Delgadio was indicted for killing Mr. Hodack. He says he told Mr. Laeser about Mr. Zuccarello's untruthfulness, and suggested to Mr. Laeser that his office re-examine the Cohen case to see if something could be done for Mr. Joslin (who was cooperating with the BSO in the Hodack case). Mr. Laeser said no to the request.

### H. MICHELLE SLATTERY AND THE RETRACTED ALIBI

Ms. Slattery, who was Mr. Zuccarello's girlfriend at the time of the Cohen murder, but had been living at Mr. Caracciolo's apartment, initially provided an alibi for Mr. Caracciolo. She said that Mr. Caracciolo and others were with her at the time of the murder. She later recanted this alibi, however, and explained that she heard Mr. Caracciolo arguing with Mr. Zuccarello and telling Mr. Zuccarello that he had not done his job. Ms. Slattery did not testify at the evidentiary hearing.

According to Mr. Caracciolo's testimony at the hearing, the argument overheard by Ms. Slattery was not about the Cohen murder, but about a prior robbery of the boyfriend of a woman named Megan Slattery (who is not related to Michelle Slattery). Mr. Caracciolo said he was upset at Mr. Zuccarello because the police were tracking Michelle Slattery concerning that robbery.

### I. GAIL BRIGHT, MARIO HERNANDEZ, AND DETECTIVE JOHN SPEAR

Detective John Spear was the lead investigator in the Cohen murder case. About three years after Ms. Cohen's trial, Detective Spear told Agent Emerson that, while he believed Ms. Cohen was involved in her husband's killing, he "did not think" that Mr. Caracciolo or Mr. Joslin were involved.

Gail Bright, a television reporter for Channel 10, the Miami ABC affiliate, testified at the hearing that, in 1993, she was doing a story on the Cohen case. During an interview at the Miami Police Department, Detective Spear told her (with the camera off) that although the authorities believed that Ms. Cohen killed her husband, "we did not have the evidence we needed" and did "what we had to do." According to Ms. Bright, Detective Spear admitted that Mr. Caracciolo, Mr. Joslin, and Mr. Zuccarello were not involved in the murder or present at the Cohen home. When Ms. Bright asked how someone who was not present could testify about the murder, Detective Spear—without mentioning anyone in particular or implicating himself in any wrongdoing—explained that one could leave a case file on a table with a prospective witness, walk out of the room, and allow the witness to familiarize himself with the details of the case. Detective Spear said that he would deny making these statements if Ms. Bright reported them. Ms. Bright did not come forward with this information until 1998, when she gave a sworn statement to Ms. Cohen's counsel.

Ms. Bright's cameraman, Mario Hernandez, corroborated some of Ms. Bright's testimony. Mr. Hernandez testified that Detective Spear had told Ms. Bright that the police thought Ms. Cohen had shot her husband, but that they could not prove it. Detective Spear also said that the other

individuals "were not there," and maintained that he would deny everything if Ms. Bright used his statements. Mr. Hernandez, however, did not hear Detective Spear say anything about how a case file could be left in a room for a prospective witness to become acquainted with the details of a crime.

Detective Spear testified at the hearing. He admitted telling Ms. Bright that "they [Mr.Caracciolo, Mr. Joslin, and Mr. Zuccarello] were not there," but said that this was merely his opinion—based on the fact that everyone was pointing fingers at everyone else—and that it had been a terrible idea to express his opinion to Ms. Bright. In Detective Spear's words, he had been second-guessing himself when he spoke to Ms. Bright, and had no information to back up his hunch. Detective Spear also admitted telling Ms. Bright that he would deny everything if she published his comments. He denied, however, ever telling Ms. Bright that a prospective witness could be left in a room with a file to learn the facts or details of a case. Finally, he testified that he now believes, based on a review of the entire case, that Mr. Caracciolo and the others were involved in the Cohen murder.

## J. The Prosecutors

Two of the prosecutors in the Cohen case, John Kasternakes and Kevin DiGregory, testified at the hearing. So did one of their supervisors, Mr. Laeser.

Mr. DiGregory testified on various topics. He said that Major Fantigrassi, who was aware of some of Mr. Joslin's admissions, never told him that Mr. Zuccarello had changed his story about the Hodack murder or had been untruthful. With respect to Mr. Zuccarello's reliability as a witness, Mr. DiGregory explained that his

comfort level was dependent on corroborating evidence. For example, Mr. Zuccarello told the authorities about the supposed meeting at Biscayne Baby's, which Mr. Middleton later confirmed.

Mr. Kasternakes testified that Mr. Zuccarello was sent to Mr. Holmes for polygraph examinations on the armed robberies. According to Mr. Kasternakes, Mr. Holmes never informed him that Mr. Zuccarello was a liar. Mr. Kasternakes also testified that, in December of 1988, Major Fantigrassi told him that he thought Mr. Zuccarello was not being forthright about Mr. Joslin's involvement in the Hodack murder. Mr. Kasternakes responded that Major Fantigrassi should take a look at the statements Mr. Joslin made while in California.[17] As to Mr. Zuccarello, Mr. Kasternakes testified that he never retracted any of his statements about the Cohen murder, and that he consistently identified Mr. Caracciolo as the shooter, though he was not sure about the number of shots fired. Mr. Kasternakes acknowledged that, in a couple of polygraph examinations of Mr. Zuccarello about the Cohen murder, the results had been somewhat conflicting or inconclusive. In one, Mr. Zuccarello was found to be "deceptive" when he said he was not at the Cohen home at the time of the murder. In another, Mr. Zuccarello was found to be "inconclusive" when he said he was not at the home on the night of the murder.

When asked about what disclosures he had made to Ms. Cohen's counsel about Mr. Zuccarello, Mr. Kasternakes admitted that he had not disclosed the untruthful statements implicating Mr. Joslin in the Hodack murder. Mr. Kasternakes explained that he believed that Ms. Cohen's counsel knew about this because he had

---

17. Major Fantigrassi admitted at the hearing that he did not interview the witnesses from California about statements made by Mr. Joslin.

asked questions about it at a pretrial bond hearing for Ms. Cohen.[18]

Mr. Laeser testified that, sometime in 1996 or 1997, Major Fantigrassi asked him to consider persuading Mr. Zuccarello to change his testimony in the Cohen case so that Mr. Joslin could vacate his murder plea. This would allow Major Fantigrassi to use Mr. Joslin as a witness (a witness who would no longer be a convicted murderer) in the Hodack murder case. Mr. Laeser said that he told Major Fantigrassi that this was impossible, and asked him to leave. Mr. Laeser also said that Major Fantigrassi never sought or obtained permission to record any of Mr. Zuccarello's conversations, and that Major Fantigrassi had given Mr. Zeid permission to do so on his own.[19]

In a newspaper article about the Cohen case in 1998, Mr. Laeser was quoted as saying that it was conceivable that Ms. Cohen acted by herself, but that he was not sure if that was the case. Mr. Laeser was also quoted as saying that, instinctively, he believed that Ms. Cohen acted alone. When asked about these statements at the hearing, Mr. Laeser explained that, on a gut level, something felt fishy because Mr. Zuccarello was a con man. Mr. Laeser also said that, on the other hand, Mr. Zuccarello was not the only witness and his testimony had been corroborated in significant respects by others. Mr. Laeser stated that he had no information indicating that Mr. Zuccarello had lied about the Cohen murder.

## IV. DISCUSSION

■ With respect to Mr. Caracciolo, there is no physical evidence (e.g., DNA, fingerprints, footprints, fibers, hair sam-

ples) which ties him to the murder or which clears him of the murder. All of the relevant evidence as to Mr. Caracciolo comes from witnesses, so their testimony, reliability, and credibility are critical in the actual innocence analysis. After reviewing the record in this case, supplemented by the transcript of Ms. Cohen's trial, I conclude that Mr. Carcciolo has not met his burden of establishing actual innocence.

In addition to the state's proffer at the change of plea hearing—which was, essentially, that Mr. Caracciolo was hired by Ms. Cohen to kill her husband and that Mr. Caracciolo shot Mr. Cohen—the evidence supporting Mr. Caracciolo's guilt includes the following: (1) Mr. Caracciolo's own statements (to the police and to fellow inmates) that he was involved in and/or committed the Cohen murder; (2) Mr. Zuccarello's eyewitness testimony about the contract for the killing with Ms. Cohen and the murder itself; (3) the statements of Mr. Joslin to friends in California implicating himself and others in the Cohen murder; (4) the testimony of Mr. Joslin at the evidentiary hearing that the gang, including Mr. Caracciolo, arrived at the Palomobo residence between 10:00 a.m. and 12 noon on March 7, 1986 (giving Mr. Caracciolo enough time to get to the Palombo residence in Lighthouse Point after killing Mr. Cohen in Coconut Grove before 5:00 a.m.); (5) Mr. Joslin's statements to the authorities in 1989 that he and Mr. Caracciolo had been involved in the Cohen murder and that Mr. Caracciolo had offered him $200,000 for an alibi; (6) the evidence at Ms. Cohen's trial that Ms. Cohen had not fired the murder weapon (thereby suggesting that someone else had fired it); (7) the testimony of Mr. Middle-

---

18. Major Fantigrassi's testimony at the hearing confirmed that, prior to Ms. Cohen's trial, Ms. Cohen's counsel knew of Mr. Zuccarello's allegedly false statements in the Hodack case.

19. Major Fantigrassi conceded at the hearing that he did not get any authorization for recording Mr. Zucarello's conversations.

ton that he saw Mr. Caracciolo, Mr. Joslin, and Ms. Cohen at the champagne room at Biscayne Baby's one night in February of 1986; (9) Jay Richitelli's numerous statements to the authorities, some under oath, to the effect that Mr. Caracciolo had admitted shooting Mr. Cohen (along with Mr. Joslin and Mr. Zuccarello); and (9) Michelle Slattery's retracted alibi.

On the other side of the ledger, of course, there was evidence supporting Mr. Caracciolo's claim of actual innocence, including (1) Mr. Caracciolo's denial of involvement in the Cohen murder; (2) the testimony by Mr. Joslin that he was not involved in the murder and that his prior statements implicating Mr. Caracciolo were false; (3) the testimony of Jay Richitelli that he had been allowed by the prosecutors and the police to read the Cohen case files to come up with a false story and that he had lied about Mr. Caracciolo's involvement in the murder; (5) the testimony of Jay Richitelli that the home invasion gang arrived at the Palombo residence at around 5:30 or 6:00 a.m. on March 7, 1986 (thereby suggesting that Mr. Caracciolo would not have had enough time to commit a murder in Coconut Grove around 5:00 a.m. and then drive north to Lighthouse Point to arrive by 6:00 a.m.); (6) the testimony of Scott Richitelli that his brother Jay and Mr. Zuccarello were going to frame Mr. Caracciolo to help themselves; (7) the inconsistencies in the statements given by Mr. Zuccarello and the other impeachment of Mr. Zuccarello's testimony at Ms. Cohen's trial; (8) the statements made by Mr. Zuccarello in his conversations with Mr. Zeid, the investigator (e.g., that he wanted to do the "right thing"); (9) the testimony of Ms. Bright and Mr. Hernandez that Detective Spear told them in 1993 that Ms. Cohen acted alone, and that Mr. Caracciolo was "not there;" (10) the additional testimony of Ms. Bright that Detective Spear said to her that the police did not have enough evidence and did what they had to do, and that a person (a prospective witness) could be left in a room with the case files until he learned the relevant details; and (11) Mr. Laeser's opinion (based on a gut feeling) that Ms. Cohen acted alone.

On this record, the evidence favorable to Mr. Caracciolo does not establish by a preponderance that any reasonable juror would have entertained a reasonable doubt about his guilt (i.e., his shooting of Mr. Cohen and/or his participation in a conspiracy to kill Mr. Cohen). First, the numerous inconsistencies in the statements given by Mr. Zuccarello (and Mr. Zuccarello's allegedly false implication of Mr. Lamberti in the Hodack case) are not "new" evidence under *Schlup* and its progeny. Those inconsistencies and false statements (as well as various other instances of impeachment) were brought out at Ms. Cohen's trial (or in pretrial proceedings in Ms. Cohen's case), and Mr. Caracciolo and his counsel were aware of them before Mr Caracciolo decided to enter his plea. I understand that I must consider not only new evidence, but old evidence as well, but it is important to keep in mind that the attacks on Mr. Zuccarello's credibility are not of recent vintage. Second, Mr. Caracciolo's denials of any involvement in the murder are significantly tempered by evidence that he made incriminating statements to others (including some admitting his shooting of Mr. Cohen) about the murder, and by the fact that Mr. Caracciolo's testimony about the chronology and time line is not completely consistent with his past statements. Third, Mr. Joslin's denials (and retraction of his earlier statements) run right into statements he made to uninterested third parties in California about his involvement with others in the murder. Fourth, a reasonable juror would not likely find Jay and

Scott Richitelli to be very credible witnesses, and would likely find Jay even less believable than his brother.[20] Jay Richitelli was serving a 40–year sentence for having violated his probation, and he blamed Mr. Kasternakes for receiving such a lengthy sentence for the violation. Moreover, Jay Richitelli invoked the Fifth Amendment when he was asked about the prior sworn statements he had given implicating Mr. Caracciolo. Furthermore, Jay Richitelli's claim about having been left alone with the Cohen case file in a room at the state attorney's office is virtually impossible to believe. The prosecutors and the police officers who dealt with Jay Richitelli denied having left him alone in a room with the Cohen case file, and a reasonable juror would likely find their denials were credible. No reasonable juror would believe that prosecutors and police officers would leave a dangerous violent criminal like Jay Richitelli alone in a room at the state attorney's office with a locked door and two female secretaries as the only obstacles to freedom or further mayhem.[21] Fifth, Mr. Zuccarello never told Mr. Zeid that he had lied about the Cohen murder, and Mr. Zuccarello has never retracted his core version of events. Mr. Zuccarello's vague statements to Mr. Zeid (e.g., wanting to "tell the truth" and "do the right thing") do not constitute recantations. Mr. Zuccarello has remained consistent about the critical matters in the Cohen murder, including Mr. Caracciolo's involvement. Sixth, the fact that Detective Spear and Mr. Laeser may have subsequently entertained personal doubts about the guilt of Mr. Caracciolo, Mr. Joslin, and Mr. Zuccarello is not enough. Given the evidence I have read and heard in this case, I myself cannot personally say to a moral certainty that Mr. Caracciolo killed Mr. Cohen, and it is understandable that a veteran police officer and a veteran prosecutor might have some lingering doubts. After all, the main witness against Mr. Caracciolo—Mr. Zuccarello—is obviously a con man who committed home invasion robberies, who was given various unbelievable (and unjustifiable) perks while a detainee or prisoner, and who was remarkably allowed to skate completely free on the Cohen murder. Yet the doubts harbored by Detective Spear and Mr. Laeser are only the opinions of individuals handling the case, and not the testimony of fact witnesses or eyewitnesses. Again, I understand that I must consider all relevant evidence, whether admissible or not under the rules of evidence, in the actual innocence inquiry, but a reasonable juror would give less weight to lay opinion evidence about Mr. Caracciolo's guilt. Seventh, assuming that a reasonable juror would credit Ms. Bright's testimony that Detective Spear told her that the police did what they had to do, and told her how a prospective witness could be left alone with case files to learn the details of a crime, and assuming that a reasonable juror would infer that Detective Spear was referring to Mr. Zucccarello when he made these statements, such evidence would at most be further impeachment of Mr. Zuccarello, for Detective Spear denied having given Mr. Zuccarello the Cohen files so that he could come up

---

**20.** I understand that I am not supposed to make an independent factual determination about what occurred, but I may, in analyzing a claim of actual innocence, take into consideration how a reasonable juror would view the credibility of witnesses. *See House,* 126 S.Ct. at 2078.

**21.** Jay Richitelli's testimony would also be "substantively unimpressive" to a reasonable juror because it came at the proverbial eleventh hour. *See Arthur v. Allen,* 452 F.3d 1234, 1245–46 (11th Cir.2006).

with a story to help the authorities.[22] Eighth, if Mr. Caracciolo's version of events on March 7 is credited, no witness can give Mr. Caracciolo an alibi on the day of the Cohen murder. According to Mr. Caracciolo, the only people at his apartment from 11:30 p.m. on March 6 to around 5:30 a.m. on March 7 were Mr. Caracciolo, Mr. Joslin, and Michelle Slattery. But Mr. Joslin testified that he cannot remember whether he stayed overnight at Mr. Caracciolo's apartment on March 6, and Ms. Slattery retracted her alibi for Mr. Caracciolo. Ninth, assuming a reasonable juror would credit Jay Richitelli's testimony that the gang stayed overnight on March 6 at Mr. Caracciolo's apartment, that testimony would conflict with Mr. Caracciolo's testimony, thereby damaging Mr. Caracciolo's credibility. Jay Richitelli's testimony would also place Mr. Zuccarello and Mr. Joslin at the apartment during the early morning hours of March 7, making it more likely that they drove together from Hallandale to Coconut Grove to commit the murder.

## V. CONCLUSION

Under *Schlup* and its progeny, Mr. Caracciolo has not shown by a preponderance that a reasonable juror would have reasonable doubt concerning his guilt. As Learned Hand once observed, "[j]uries are not leaves swayed by every breath," *United States v. Garsson*, 291 F. 646, 649 (S.D.N.Y.1923), and the evidence presented by Mr. Caracciolo is simply too inconsistent, too conflicting, and too unreliable to make the necessary showing of actual innocence. Because Mr. Caracciolo has not met his burden of establishing actual innocence, Claims IV and V remain procedurally barred, and I do not address their merits.[23]

This case is closed.

---

22. Things might be different if the *only* evidence against Mr. Caraccciolo came from Mr. Zuccarello. But, as set forth in this order, that is not the state of the record.

23. I note, though, that Claim IV (claim that state court's failure to hold an evidentiary hearing on post-conviction motion violated due process) appears foreclosed by Eleventh Circuit precedent. *See Anderson v. Secretary, Dept. of Corrections*, 462 F.3d 1319, 1330 (11th Cir.2006); *Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir.1987).